**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel. [UNDER SEAL],** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **CIVIL ACTION NO: ____________________** |
| | ) | **FILED UNDER SEAL** |
| | ) | ***DO NOT FILE IN PACER*** |
| **[UNDER SEAL],** | ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) | |

---

**FILED UNDER SEAL**

---

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF SOUTH CAROLINA**

<table>
<tr><td>UNITED STATES OF AMERICA, ex rel. JAMES BRASHER IV<br><br>Plaintiffs,<br><br>v.<br><br>EMPIRE CORPORATION OF TENNESSEE, INC.; and PINNACLE PROPERTY MANAGEMENT SERVICES, LLC d/b/a PINNACLE LIVING<br><br>Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>CIVIL ACTION NO:<br>____________________<br><br>FILED UNDER SEAL<br><br>JURY TRIAL DEMANDED</td></tr>
</table>

**FALSE CLAIMS COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. Relator James Brasher IV brings this action on behalf of the United States against Defendants Empire Corporation of Tennessee, Inc. and Pinnacle Property Management Services, LLC d/b/a Pinnacle Living (collectively "Defendants") for treble damages and civil penalties arising from the Defendants' false statements and false claims in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

## II. JURISDICTION AND VENUE

2. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

3. At all times material to this Complaint, Defendants regularly conducted business within the South Carolina and maintained permanent employees and offices in South Carolina. Defendants are, therefore, subject to personal jurisdiction in South Carolina.

4. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because each Defendant transacts business within and the acts of Defendants alleged in this Complaint occurred within this District.

## III. PARTIES

5. Relator James Brasher IV is a citizen of the United States over the age of eighteen and a resident of the State of Alabama.

6. The Relator is the original source of the information underlying this Complaint provided to the United States. The Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States as required by the False Claims Act, 31 U.S.C. § 3730(b)(2). The Relator does not believe any of

the information underlying the allegations and transactions in this Complaint has been publicly disclosed.

7. Defendant Empire Corporation of Tennessee, Inc. ("Empire") is a Tennessee corporation with its corporate headquarters at 3600 Henson Road, Knoxville, Tennessee 37921, and provides construction services within the State of South Carolina. Defendant Empire's registered agent, Corporation Service Company, may be served at 1703 Laurel Street, Columbia, South Carolina 29201. At all times relevant to this action, Defendant Empire was principally engaged in providing construction services as part of the rehabilitation project of Section 8 housing in Spartanburg, South Carolina.

8. Defendant Pinnacle Property Management Services, LLC d/b/a Pinnacle Living ("Pinnacle") is a Delaware limited liability company with its corporate headquarters at 5055 Keller Springs Road, Suite 400, Addison, Texas 75001, and provides property management services within the State of South Carolina. Defendant Pinnacle's registered agent, Eilson F. Baker, may be served at 4516 Highway 17 Business Murrells Inlet, South Carolina 29576. At all times relevant to this action, Defendant Pinnacle was principally engaged in providing property management services of Section 8 housing in Spartanburg, South Carolina.

## IV. THE RENTAL ASSISTANCE DEMONSTRATION PROGRAM

9. As part of the Consolidated and Further Continuing Appropriation Act of 2012, Congress enacted the Rental Assistance Demonstration ("RAD") program, which is administered by the Department of Housing and Urban Development ("HUD"). 42 U.S.C. § 1437f; Pub. L. No. 112-55, 125 Stat 552 (2011).

10. The RAD program allows public housing authorities to apply with HUD to convert low-income public housing into Section 8 Project Based Voucher Contracts.

11. Section 8 of the Housing Act of 1937 authorizes rental assistance for low-income households to be paid to private landlords through voucher programs, including project-based vouchers. Public housing authorities receive federal funds from HUD to administer the voucher program.

12. Section 8 Project Based Voucher Contracts are federally-funded subsidy contracts that provide Project-Based Vouchers ("PBVs") to private entities to keep public housing affordable for low-income households. PBVs are rental vouchers that are attached to public housing units, meaning the vouchers remain with the housing unit when residents move residences. PBVs are paid to private entities that manage the public housing.

13. Once HUD approves the conversion of public housing, the public housing authority can mortgage the public housing property or use the property as collateral to secure private funding and investments. In other words, the public housing authority can use public housing to borrow money from private entities through mortgages and security agreements.

14. Ideally, the funds and investments obtained through the mortgages and security agreements—coupled with PBV subsidies—are used to finance public housing rehabilitation, i.e. repairs.

15. Also, mortgages on the public housing property are federally insured against losses for private entities to facilitate rehabilitation projects. Pursuant to the Section 221(d)(4) program, the Federal Housing Administration ("FHA"), which is a HUD agency, insures mortgage loans that private entities make to public housing authorities. 12 U.S.C. § 17151(d)(4). FHA insures mortgages on public housing against losses private entities would incur because of a default on the mortgage.

16. Further, to encourage private investors to invest in public housing and to assist in funding rehabilitation projects, the RAD program allocates Low-Income Housing Tax Credits ("LIHTC") to private investors in exchange for their investment.

## V. **<u>THE SUBMISSION OF FALSE CLAIMS</u>**

17. Since January 2016, Defendants Empire and Pinnacle engaged in a conspiracy to defraud the Department of Housing and Urban Development ("HUD") during rehabilitation of low-income Section 8 housing in Spartanburg, South Carolina. The rehabilitation was federally funded through the Rental Assistance Demonstration ("RAD") program. As part of this fraudulent scheme, Defendant Empire engaged in a pattern of providing construction work that was not in conformity with Project Manual and Drawings ("the Drawings") provided to HUD, because the construction work was either substandard or not completed. Further, Defendant Pinnacle knowingly approved Empire's substandard work and allowed residents to re-enter the premises despite knowing the construction work did not conform to Drawings, which caused false claims to be submitted to HUD and places the residents' health and safety in jeopardy. Defendant Pinnacle materially benefitted the approval of Empire's shoddy work by quickly placing residents back into the public housing in order to receive Section 8 Project-Based Vouchers ("PBV") funds.

18. Relator Brasher has direct knowledge of Defendants' fraud against HUD through personal experiences during the scope of his employment with Defendant Empire, observation of the construction process employed by Defendants, conversations with Defendants and co-conspirators, and personal investigation into Defendants' and co-conspirators' fraudulent practices.

## VI. FACTS

### A. The Spartanburg 7 Project

19. Due to declining infrastructure and poor living conditions at low-income multifamily subsidized housing communities in seven locations in Spartanburg, South Carolina, the Spartanburg Housing Authority sought federal funds to rehabilitate the property by utilizing the Rental Assistance Demonstration ("RAD") program administered by the Department of Housing and Urban Development ("HUD").

20. Spartanburg Housing Authority sought to rehabilitate the following seven low-income housing communities: Barksdale Apartments; Tobias Booker Hartwell Apartments; Leland Street Apartments; Frank Gooch Apartments; Ellen C. Watson Apartments; Spruce Street Apartments; and J.C. Anderson Townhomes (collectively "Spartanburg 7" or "Spartanburg Scattered Sites"). The Spartanburg 7 consist of 338 public housing units.

21. After receiving HUD approval for participation in the RAD program, Spartanburg Housing Authority converted the Spartanburg 7 into Section 8 Project Based Voucher Contracts to obtain federal funds and to mortgage the rehabilitation project.

22. As a result of the conversion, SHA7, LLC became owner of the Spartanburg 7. SHA7, LLC is a subsidiary of the Spartanburg Housing Authority

and/or Hunt Companies, Inc.—which is an El Paso, Texas-based real estate investment company. SHA7, LLC has represented its home office as the same as Hunt Companies, Inc. via certificates and paperwork provided to HUD.

23. Further, SHA7, LLC and Defendant Pinnacle, as owner and property manager, respectively, obtained the ability to receive federal funds through the Section 8 Project-Based Voucher ("PBV") program to provide housing to low-income households.

24. On or about April 15, 2014, Spartanburg Housing Authority solicited invitations for bids to select a general contractor for the rehabilitation of the Spartanburg 7.

25. The rehabilitation project was entitled "Substantial Rehabilitation Spartanburg HA RAD 7."

26. The rehabilitation project sought repairs, renovations, and replacement of roofs, flooring, plumbing, electrical, HVAC, exterior doors, among other repairs at the Spartanburg 7 sites.

27. The Spartanburg 7 project was funded through the RAD program. Specifically, the Federal Housing Administration ("FHA")—a HUD agency—insured the mortgage loans (amounting to approximately $9,500,000) for the

Spartanburg 7 project pursuant to the Section 221(d)(4) program.[1] The Spartanburg 7 project is FHA project number 054-35831.

28. Between April 15 and May 15, 2014, Defendant Empire submitted a bid for general contractor of the Spartanburg 7 rehabilitation project.

29. The Spartanburg Housing Authority ultimately contracted with Defendant Empire as the general contractor for the Spartanburg 7 project.

30. Defendant Empire entered the contract falsely stating it would perform the work as described in the Drawings provided to HUD.

B. Defendant Empire Employs Relator Brasher

31. Relator Brasher has worked in the construction industry and as a construction manager throughout his career. Relator Brasher has worked on at least four projects that HUD funded through the RAD program.

32. In February 2016, the superintendent for Defendant Empire at a location in Atlanta, Georgia, contacted Relator Brasher with an opportunity to apply for employment with Defendant Empire as a construction manager for the Spartanburg 7 project in Spartanburg, South Carolina.

33. On February 23, 2016, Defendant Empire offered Relator Brasher the position as a Construction Manager at the Barksdale location of the Spartanburg 7

[1] *Rental Assistance Demonstration (RAD) Program PowerPoint*, SPARTANBURG HOUSING AUTHORITY, *available at* https://www.shasc.org/plugins/show_image.php?id=279.

project, which he accepted.

34. As Construction Manager, Relator Brasher's job description was to oversee the planning and coordination of the rehabilitation project at the Barksdale location. Relator Brasher's job duties included ordering construction materials, ensuring workers' safety, ensuring sub-contractors adhered to the scope of work in the Drawings, and notifying the Project Managers of any non-compliance.

35. On March 2, 2016, Relator Brasher began his employment as Construction Manager with Defendant Empire in Spartanburg.

36. Throughout his employment, Relator Brasher worked primarily at the Barksdale and Tobias locations of the Spartanburg 7 project.

37. Relator Brasher was directly supervised by Ron Pingrey, who Defendant Empire employed as "Superintendent."

38. Superintendent Pingrey told Relator Brasher that any questions or problems at the jobsite should be addressed to him and no one else.

39. Also, Defendant Empire employed Bryan Webb and Andrew Sutherland as "Project Managers." The Project Managers oversaw Superintendent Pingrey in addition to Relator Brasher.

C. <u>Relator Brasher Discovers Fraudulent Activity during the Construction of the Spartanburg 7</u>

40. As part of his employment as Construction Manager, Defendant Empire provided Relator Brasher with a copy of the Drawings. The Drawings are

a detailed set of documents listing the scope of work and blueprints for the Spartanburg 7 project. Defendant Empire and its subcontractors for the Spartanburg 7 were required to adhere to the scope of work and blueprints in the Drawings.

41. Upon information and belief, as part of the RAD program, Defendant Empire—by and through SHA7, LLC and/or the Spartanburg Housing Authority—was required to submit the Project Manual and Drawings to HUD for approval.

42. Beginning in April 2016, Relator Brasher discovered Defendant Empire and its subcontractors were not adhering to the Drawings.

43. Further, Defendant Empire instructed its employees, including Relator Brasher, and its subcontractors to disregard the Drawings to retain unearned funds from the Spartanburg 7 Project.

44. For instance, Superintendent Pingrey would regularly tell employees and sub-contractors that the construction "didn't have to be perfect, just get it to last a year."

45. As a result, the construction work Defendant Empire and its subcontractors (which were subject to its supervision) performed with regard to the Spartanburg 7 locations materially failed to conform to the Drawings, as outlined further below.

46. Relator Brasher discovered the fraudulent activity at the Barksdale location described herein because Barksdale was the site for which he was Construction Manager. Further, Relator Brasher discovered the fraudulent activity at the Tobias location described herein because Defendant Empire used the Tobias location buildings as offices for meetings. Relator Brasher regularly attended meetings and observed construction at the Tobias location.

47. At the Tobias location, the Drawings provided that Defendant Empire "Patch and repair existing damaged areas of existing walls and ceilings . . . Clean and prepare all surfaces of walls and ceilings to insure the proper adhesion of new paint . . . Prime and paint all walls, ceilings, and trim." At the Barksdale location, the Drawings provided the same requirements as the Tobias location and added that Defendant Empire "Repair damaged ceilings from previous second floor leaks."

48. Despite the scope of work requirements in the Drawings for preparing, repairing, and painting walls, Defendant Empire failed to conform to the Drawings at both the Tobias and Barksdale locations. Defendant Empire failed to remove large amounts of mold and asbestos that was found at both locations. Rather than cleaning and preparing the walls for painting by removing the mold, Defendant Empire instructed painters to paint over the mold. Particularly moldy areas included hot water closets, bathrooms, and kitchens. This mold puts Section

8 residents' health at risk.

49. At the Barksdale location, the Drawings provided that Defendant Empire "Properly prepare, seal coat, and re-stripe all existing drive and parking areas."

50. Defendant Empire failed to conform to the Drawings regarding the drive and parking areas in that Defendant entirely failed to prepare, seal coat, and re-stripe those areas at the Barksdale location.

51. Also, at the Barksdale location, Defendant Empire painted over damaged areas where leaks had occurred rather than "Repair[ing] damaged ceilings from previous second floor leaks."

52. With respect to flooring, the Drawings provided that Defendant Empire "Repair and level slab throughout" the housing units at Tobias and Barksdale. Repairing and leveling the slab beneath the floor at the units required Defendant Empire to remove the existing flooring to access the slab. Rather than repair and level the slab beneath the existing flooring, Defendant Empire placed new carpet over the damaged, unlevel slab without inspecting the slab. The result was unlevel floors having weak spots, mold, and asbestos underneath.

53. The floors are visibly unlevel in in units 104 through 108 at the Barksdale location.

54. Moreover, with respect to flooring at the Barksdale location, the

Drawings required Defendant Empire to "[r]emove existing vinyl tile in living rooms, bedrooms, halls, and kitchens." Defendant Empire placed new flooring over the existing vinyl tile without removing it as detailed in the scope of work.

55. Next, the Drawings provided the following rehabilitation for roofing at all seven of the Spartanburg 7 locations:

- Removal of existing roofing, underlayment, flashing, and trim;
- Inspection and repairing existing damage, rotted deck using wood of same thickness; and
- New underlayment, flashing, trim, and roof shingles.

56. Rather than inspect and repair the damaged or rotted wood deck (which is the roofing material under the shingles and underlayment), Defendant Empire covered it up with new underlayment and shingles. The result was a roof with damaged and/or rotten wood deck that is susceptible to roof leaks.

57. At the Barksdale location, the Drawings proscribed that Defendant Empire remove the existing windows and window hardware at the units, prepare existing window openings with flashing, and install new energy-efficient windows and screens."

58. Rather than properly install and frame the windows by preparing the openings with flashing, Defendant Empire merely used caulk and a few screws to attach the windows to the building. The windows Defendant Empire installed expose residents to burglaries and other crimes because the caulking could easily give way to slight force a perpetrator uses to open the window. Furthermore, the

windows now provide insufficient insulation from the elements.

59. With respect to the stairs inside the units at the Barksdale location, the Drawings required Defendant Empire to "Secure existing loose stair treads [and] Remove a portion of existing second floor wall at stair and provide handrail and banister pickets as indicated on the Drawings."

60. However, Defendant Empire did not secure the loose stairs and left some steps cracked and weak, exposing residents to injurious falls.

61. Further exposing residents to injurious falls, Defendant Empire failed to construct handrails because Superintendent Pingrey stated the handrails cost too much and were not needed.

62. The Drawings also provided that Defendant Empire "Inspect existing flues and ductwork [and] Clean existing ductwork" of the Heating, Ventilating, and Air Conditioning ("HVAC") systems at both the Tobias and Barksdale locations. However, Defendant Empire cut corners by failing to clean the systems, allowing dust and mold to accumulate in the HVAC system.

63. At the Tobias location, the Drawings required Defendant Empire to "Provide new shed roof canopy at each unprotected rear door" and specified the details of how to construct the canopies. The canopies Defendant Empire constructed failed to conform to the Drawings' detailed instructions for the canopies' construction.

64. At the Barksdale location, the Drawings required Defendant Empire to "Install new individual water meters and water service lines as specified by the City of Spartanburg at each Unit [and] Repair damage created in the performance of the new work including grading and grassing" because the entire Barksdale location was previously served by one water meter.

65. The phrase "repair damages . . . including grading and grassing" implied that the water meters be placed underground. Rather, than placing the water meters underground and in the proper location, Defendant Empire placed the water meters by the hot water heaters in each unit. Placing the water meters by the hot water heaters effectively allows the use cold water without residents being billed for cold water usage.

66. Instead of correcting the Defendant Empire's mistake with regard to the water meters, Superintendent Pingrey instructed employs to leave the water meters at their position by the hot water heaters as a means to save expenses that would be incurred in moving the water meters. Moving the water meters to the correct location on the Drawings would involve extensive digging on site to place the water meters on the piping leading to the source of the city water supply.

67. Moreover, the Drawings provided that Defendant Empire replace the flanges on toilets, which are rings that hold the toilet to the floor. Failure to replace the flanges results in leaks and render toilets unusable. Defendant Empire

instructed the plumbing subcontractor not to replace the flanges.

68. Defendant Empire's fraudulent disregard of and non-conformance with the Drawings resulted in Section 8 housing that failed to conform to scope of work and Drawings provided to HUD for approval through the RAD program.

69. In addition to disregarding the Drawings during the rehabilitation project, Defendant Empire's Superintendent Ron Pingrey ordered Empire employees and subcontractors, including Relator Brasher, to intentionally and needlessly damage units and to document the damage to bill for the damage.

70. Relator Brasher refused to comply with Superintendent Pingrey's orders to damage the units, but other Empire employees and subcontractors complied, resulting in fraudulent billing for unnecessary damage to the units.

71. For instance, in early July 2016, Superintendent Pingrey instructed Relator Brasher to enter each unit at the Barksdale location, to destroy the plumbing valves and controls for the showers and toilets, and to take photographs to document the damage so that Defendant Empire could charge for the repairs.

72. In early July 2016, this fraudulent practice was acknowledged by Defendant Empire Construction Manager Gene Wilson, who stated to Relator Brasher, "We're going to have to make shit up" regarding the plumbing system and "we have to be creative to justify" billing for the repairs even though it was "lying."

73. Relator Brasher refused to destroy the plumbing systems. In reply, Superintendent Pingrey responded that Relator Brasher was "not a team player."

74. Further, Superintendent Pingrey ordered Empire employees and subcontractors, including Relator Brasher, to take pictures of repairs needed in units and falsely document the repairs as being needed for other units—i.e. units other than the one from which the picture was taken.

75. For example, if Unit 101 needed repairs but Unit 102 did not, Superintended Pingrey would tell employees to take photographs of the repairs needed in Unit 101 and to document the repairs as being needed for both Unit 101 and Unit 102.

76. Relator Brasher refused to engage in the fraudulent practice of taking pictures of damaged units and bill the repairs as being needed for another unit.

D. Defendants Engaged in a Fraudulent Scheme to Submit False Claims to HUD

77. After Defendant Empire completed the construction work at a unit, Defendant Pinnacle would inspect the work to allow residents who were displaced during the construction process to re-enter the premises.

78. Defendant Pinnacle tasked Semonique Ingram, who is the Area Property Manager for Pinnacle, with inspecting the construction work and with approving the work before residents could reenter the units.

79. Defendant Pinnacle tasked Ms. Ingram with such inspections at the Spartanburg 7 units despite the fact she lacked a background in construction. Because she does not have a construction background, Ms. Ingram was unable to ensure construction work was completed in compliance with the Drawings.

80. An employee of Defendant Empire regularly attended Ms. Ingram's inspections.

81. Before he reported the fraudulent activity to his superiors at Empire (as described in detail in section VI E. of this complaint), Relator Brasher attended the inspections and told Semonique Ingram about the Empire's noncompliance with the Drawings.

82. When Relator told Ms. Ingram about Empire's non-conformities with the Drawings, she seemed concerned and generally addressed the nonconformities to her supervisor, Jimmy (whose last name is unknown).

83. Ms. Ingram's supervisor at Pinnacle, Jimmy, told her to continue to approve the units notwithstanding the nonconformities with the drawings and health concerns.

84. Despite Relator's comments to Defendant Pinnacle and the nonconformities with the Drawings, Defendant Pinnacle knowingly approved of Empire's inadequate work, allowed residents to reenter their residences, and caused claims for payment to be submitted to HUD in the Contractor's Requisition

forms and the Application and Certification for Payment forms (as discussed in detail in paragraphs 98–110 of this Complaint).

85. After Relator Brasher reported the fraud to Empire's Project Managers and Superintendent Pingrey (as described in detail in section VI E. of this Complaint), Superintendent Pingrey told him that he was no longer allowed to attend inspections with Ms. Ingram.

86. Further, Ms. Ingram's superior at Defendant Pinnacle, Jimmy, regularly told Relator Brasher to "do what Ron [Pingrey] says," including covering mold with paint.

87. During the inspection, Defendant Pinnacle completed "Certificate of Substantial Completion and Acceptance" ("Certificates"), which Defendant Pinnacle signed to certify that "I (we) have inspected the work performed and find the job completed to our satisfaction." Certificates were completed for each unit at the Spartanburg 7 locations. Defendant Pinnacle ultimately sent these forms to HUD.

88. Defendant Pinnacle generally discussed the units with Superintendent Pingrey before signing the Certificates.

89. In these meetings with Superintendent Pingrey before signing Certificates, Defendants Pinnacle and Empire conspired to defraud HUD.

90. On July 15, 2016, after conspiring with Defendant Empire, Defendant

Pinnacle signed numerous Certificates for the Barksdale location that omitted the various non-conformities with the Drawings discussed in section VI C. of this Complaint.

91. Defendant Pinnacle knowingly approved Empire's substandard, nonconforming work to quickly allow residents to reenter the units to enable Pinnacle to receive HUD-funding in the form of Section 8 vouchers, specifically PBVs.

92. Defendant Pinnacle received, and presently continues to receive, fraudulently obtained PBVs because the Spartanburg 7 project was not completed in conformance with the Drawings.

93. Further, Defendants Empire conspired with Chris Lewis, who was Senior Building Code Inspector for the City of Spartanburg, to submit claims for rehabilitating units that failed to comply with the city code requirements for residential buildings.

94. Beginning in May 2016 until his termination in July 2016, Relator Brasher regularly told Tim Wilson, another Inspector for the City of Spartanburg, about unsafe areas and nonconformities to the Drawings in the Spartanburg 7 units.

95. During that same period, Inspector Lewis often told Relator Brasher that work within the units at Barksdale were "out of code" but, the next day, would

tell Relator Brasher to "let it go" because "it's above my head."

96. Inspector Lewis informed Relator Brasher that Senior Building Code Inspector Chris Lewis made final decisions regarding whether units passed city inspections. Further, Chris Lewis overruled Inspector Lewis's determinations that the Spartanburg 7 units failed to conform to the city code.

97. Ultimately, Defendant Empire, Defendant Pinnacle, and Chris Lewis conspired to and did allow residents to re-enter the Spartanburg 7 units despite their knowledge that the units did not conform to the Drawings or to city building code and were not safe for habitation.

98. Also, after completing the work and the inspections by Defendant Pinnacle and Chris Lewis, Defendant Empire would complete a "Contractor's Requisition" form to HUD for payment. The Contractor's Requisition form number is HU-92448-OHF (1/19).

99. The Contractor's Requisition, HUD-92448-OHF, form provides as follows:

> This information is used to verify program benefits consisting of distribution of insured mortgage proceeds when construction costs are involved. The information regarding completed work items is used by HUD to insure that payments from mortgage proceeds are made for work actually completed in a satisfactory manner.

100. On June 30, 2016, Defendant Empire made and completed a Contractor's Requisition form for the Spartanburg 7 construction work up to that

date.

101. In making the June 30th Contractor's Requisition form, Defendant Empire President Rick Cheverton signed the document certifying that "I hereby Certify that all the information state herein, as well as any information provided in the accompaniment herewith, is true and accurate." Further, the document explicitly warns that "**Warning: HUD will prosecute false claims and statements.**"

102. Despite the warnings and certification in the Contractor's Requisition form presented to HUD, Defendants Empire and Pinnacle and co-conspirator Chris Lewis conspired to and actually sought payment for construction that was not completed and for substandard work, including work for carpentry, roofing, windows, drywall, plumbing, and electrical.

103. Defendant Empire, Defendant Pinnacle, and co-conspirator Chris Lewis conspired to, knowingly presented, or caused to be presented, the Contractor's form from June 30, 2016, to HUD for payment despite Defendants' fraudulent activity during Spartanburg 7's construction.

104. Further, Defendant Empire submitted and Defendant Pinnacle caused to be submitted, in conspiracy with Chris Lewis, "Application and Certification for Payment" forms for approval. Such applications require the following certification: "The undersigned Contractor certifies that to the best of the

Contractor's knowledge information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents."

105. On June 30, 2016, Empire President Cheverton signed an Application for Payment seeking payment for work that was not completed in accordance with the Contract Documents, such as the Drawings.

106. At the Barksdale location, fraudulent charges included charges for wood decking for roofs, wall preparation, repairing ceilings from leaks, flanges for toilets, water meter installation, repairing the water meter install areas, cleaning the ductwork, among others.

107. At the Tobias location, fraudulent charges include charges for repairing and leveling the slab, replacing wood decking for roofs, completing back-door overhangs, and cleaning the ductwork.

108. Defendant Empire, Defendant Pinnacle, and co-conspirator Chris Lewis conspired to, knowingly presented, or caused to be presented, the Application for Payment on June 30, 2016, to HUD for payment despite the fraudulent activity during Spartanburg 7's construction.

109. Contractor's Requisition forms and Application and Certification for Payment forms were submitted by Defendant Empire, by and through their conspiracy with Defendant Pinnacle and Chris Lewis, every month beginning in

March 2016 until completion of the Spartanburg 7 project on or about April 2017.

110. Starting on or about March 2016 and continuing until project completion on or about April 2017, at least thirteen false and fraudulent Contractors Requisition forms and at least thirteen false and fraudulent Application for Payment forms were submitted every month, totaling twenty-six false statements during the Spartanburg 7 rehabilitation project. Each false or fraudulent form submitted constitutes a violation of the False Claims Act.

111. Furthermore, starting on or about March 2016 and continuing until the present, Defendant Pinnacle is fraudulently obtaining and retaining Section 8 PBV payments from HUD despite knowingly conspiring and certifying the Spartanburg 7 rehabilitation project complied with the Drawings.

112. Defendants Empire and Pinnacle established a *qui pro quo* where Empire received payment for its construction work that failed to conform to the Drawings and Pinnacle received, and continues to receive, PBVs for Section 8 housing through the RAD program.

E. Relator Brasher Reports the Fraudulent Activity

113. Beginning in mid-April 2016, Relator Brasher reported the fraudulent activity occurring at the Spartanburg 7 locations described in section VI C. of this complaint to Defendant Empire Superintendent Pingrey.

114. Upon confronting him with the fraudulent activity occurring during

the rehabilitation project, Superintendent Pingrey told Relator Brasher that his concerns regarding conformance with the Drawings were above Relator Brasher's paygrade.

115. Discontent with Superintendent Pingrey's response to his concerns, Relator Brasher began addressing the same concerns regarding the fraudulent activity to Defendant Empire Project Managers Bryan Webb and Andrew Sutherland in late April 2016.

116. Project Managers Bryan Webb and Andrew Sutherland failed to address Relator Brasher's concerns.

117. After Relator Brasher addressed his concerns to Webb and Sutherland, Superintendent Pingrey verbally reprimanded him for "going over his head" and addressing concerns to Pingrey's superiors.

118. Also, beginning in May 2016 until his termination in July 2016, Relator Brasher often reported information concerning unsafe areas and nonconformities to the Drawings in the Spartanburg 7 units to Spartanburg Inspector Tim Wilson, who stated the units were not compliant with the city code for residential buildings but Senior Building Code Inspector Chris Lewis instructed him to approve the units.

119. Additionally, from May 2016 until his termination in July 2016, Relator Brasher reported the nonconformities with the drawings and risks to

residents' health and safety—such as mold, asbestos, and improperly installed stairs and windows—to Defendant Pinnacle.

120. During that time period, Relator Brasher regularly reported such problems with Empire's construction during the rehabilitation of Spartanburg 7 to Pinnacle's Area Property Manager, Ms. Ingram.

121. Ms. Ingram notified her supervisor, Jimmy (whose last name is not known), of the issues Relator Brasher reported to her, but Jimmy told her to continue to approve the inspections of the units to enable residents to reenter the units, despite the nonconformities to the Drawings and the health and safety risks to residents.

122. In early June 2016, Defendant Empire hired Gene Wilson as Construction Manager to "help" Relator Brasher. Further, Relator Brasher was instructed to train Gene Wilson—despite having the same job title as Relator Brasher—because he was inexperienced with the day-to-day operations of a construction site.

123. Relator Brasher immediately told Mr. Wilson about Defendant's fraudulent activity at the Spartanburg 7 project in June 2016.

124. On July 7, 2016, Relator Brasher addressed his concerns to Defendant Empire's President, Rick Cheverton, via email in an attempt to remedy

the fraudulent practices and because Relator feared losing his job.

125. In the July 7th email to President Cheverton, Relator Brasher communicated the following:

> I have been told by my superintendent to do things that are not in our drawings and to "not" do things that are specifically in the drawings . . . . I have had this conversation with Bryan [Webb] and days after I got my butt chewed out for going over heads . . . . I just want to know what I can do to correct this situation. I'm stepping on toes coming to you like this but I have no choice.

126. President Cheverton did not respond to Relator Brasher's email, and Relator Brasher's employment was terminated two weeks later.

127. On July 22, 2016, two days after his termination, Relator Brasher sent an email to Senior Vice President Robert Kelly of Hunt Companies because Mr. Kelly met with Ron Pingrey of Empire and Jimmy of Pinnacle at least once a month regarding the Spartanburg 7 rehabilitation project.

128. In the July 22nd email to Mr. Kelly, Relator Brasher stated that he had proof of fraud at the Barksdale location, which he "tried to take . . . to the higher ups and could not get a response but did get fired two weeks later."

129. Further, Relator Brasher specifically identified in the email that he spoke with "numerous people at the City of Spartanburg" (meaning inspectors Tim Wilson and Chris Lewis) and Pinnacle.

130. Mr. Kelly did not respond to the July 22nd email.

F. Defendant Empire Discharged Relator Brasher in Retaliation

131. On July 20, 2016, just two weeks after emailing President Cheverton in an effort to stop the false claims and conspiracy alleged herein, Defendant Empire terminated Relator Brasher's employment as Construction Manager.

132. Relator Brasher was discharged after working until approximately 5:30 PM when Defendant Empire handed him a Separation Notice.

133. Defendant Empire stated in the Separation Notice that Relator Brasher was "Discharged due to performance issues."

134. Defendant Empire discharged Relator Brasher despite positive reviews by Superintendent Pingrey and Project Manager Bryan Webb in job performance evaluations.

135. After terminating Relator Brasher, Defendant Empire promoted Gene Wilson—the individual hired after Relator Brasher reported the fraudulent activity to his superiors—to Construction Manager.

## COUNT ONE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS
## (31 U.S.C. §§ 3729 *et seq*.)

136. Relator re-alleges and incorporates the allegations in paragraphs 1–135 as if fully set forth herein.

137. Defendant Empire knowingly presented or caused to be presented

false or fraudulent claims for payment or approval to the United States, in the form of providing incomplete and/or inadequate construction work that did not conform to the Drawings; billing for such incomplete or inadequate construction work; destroying units to bill for replacement work; falsely certifying that Defendant Empire complied with the Drawings and HUD requirements; falsely stating in inspection reports that the repairs where satisfactorily completed; and failing to disclose that Defendant Empire was not compliant with the Drawings where such compliance is a condition for and affects eligibility for HUD payment.

138. Defendant Pinnacle knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, in the form of falsely stating in inspection reports that the repairs where satisfactorily completed and failing to disclose that Defendant Empire was not compliant with the Drawings where Pinnacle had knowledge Empire was not compliant with the Drawings and that such compliance is a condition for and affects eligibility for HUD payment.

139. Defendant Empire knowingly made or caused to be made a false record or statement material to a false or fraudulent claim to the United States, in the form of Contractor's Requisition and Application for Payment forms in which Defendant Empire falsely certified that Defendant Empire was completing the work in a satisfactory manner, that information in the reports were true and

accurate, and that the work was completed in accordance with the Contract Documents and Drawings.

140. Defendant Empire knowingly made or caused to be made a false record or statement material to a false or fraudulent claim to the United States, in the form of Contractor's Requisition forms and Application for Payment forms in which Defendant Empire falsely certified that Defendant Empire was completing the work in a satisfactory manner, that information in the reports were true and accurate, and that the work was completed in accordance with the Contract Documents and Drawings.

141. Defendant Pinnacle knowingly made or caused to be made a false record or statement material to a false or fraudulent claim to the United States, in the form of approving Empire's work and allowing residents to reenter the units, which enabled Empire to submit Contractor's Requisition and Application for Payment forms in which Defendant Empire falsely certified that Defendant Empire was completing the work in a satisfactory manner, that information in the reports were true and accurate, and that the work was completed in accordance with the Contract Documents and Drawings.

142. Defendant Empire fraudulently billed for and received payment for construction services through the RAD program as further detailed in section VI of this complaint.

143. Defendant Pinnacle fraudulently received, and currently receives, Project-Based Vouchers ("PBVs") for Section 8 housing through the RAD program based on its participation in the scheme as further detailed in section VI of this complaint.

144. By virtue of the false or fraudulent claims knowingly made or caused to be made by Defendant Empire and Pinnacle, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation.

145. Defendants Empire and Pinnacle's course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); 3729(a)(l)(B); & 3729(a)(1)(G).

## COUNT TWO

## CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT (31 U.S.C. §§ 3729 *et seq*.)

146. Relator re-alleges and incorporates the allegations in paragraphs 1–135 as if fully set forth herein.

147. Defendant Empire knowingly engaged in a conspiracy with Defendant Pinnacle where Empire provided construction services that did not conform to the Drawings, and Pinnacle provided inspections approving of Empire's work and allowed residents to reenter the units knowing the construction did not conform to

the Drawings as a means to recover funds through the RAD program.

148. Further, Defendant Empire knowingly engaged in a conspiracy with Defendant Pinnacle where Pinnacle provided inspections approving Empire's construction work despite knowing the construction did not conform to the Drawings as a means for Empire to falsely certify in Contractor's Requisition forms and Application for Payment forms that Defendant Empire was completing the work in a satisfactory manner, that information in the reports were true and accurate, and that the work was completed in accordance with the Contract Documents and Drawings.

149. The *quid pro quo* between Defendants Empire and Pinnacle was established to enable Empire to receive payment for its construction work that failed to conform to the Drawings and Pinnacle to receive Project-Based Vouchers for Section 8 housing through the RAD program.

150. Defendant Empire and Defendant Pinnacle knowingly engaged in a conspiracy with co-conspirator Chris Lewis and each other where Empire provided construction work that did not conform to the Contract Documents and Drawings, Pinnacle provided false inspections, and Chris Lewis provided fraudulent inspections approving of the work despite knowing the units were such that the units did not conform to the city code for residential buildings and placed

residents' health and safety at risk as a means to recover funds through the RAD program.

151. These conspiracies by Defendant Empire, Defendant Pinnacle, and co-conspirator Chris Lewis were knowingly done to violate the False Claims Act.

152. By virtue of the conspiracy knowingly made or caused to be made by Defendants Empire and Pinnacle and co-conspirator Chris Lewis, the United States suffered damages and, therefore, is entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation.

153. Defendants Empire and Pinnacle's course of conduct violates 31 U.S.C. §§ 3729(a)(l)(C).

## COUNT THREE

## FEDERAL FALSE CLAIMS ACT VIOLATIONS FOR CONCEALING AND RETAINING OVERPAYMENTS
**(31 U.S.C. §§ 3729, *et seq.*)**

154. Relator re-alleges and incorporates the allegations in paragraphs 1–135 as if fully set forth herein.

155. Defendant Empire knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of obtaining and retaining overpayments from HUD through the RAD program for construction work that did not conform to the Drawings.

156. Defendant Pinnacle knowingly made or used false or fraudulent statements, or caused false or fraudulent statements to be made or used, for the purpose of obtaining and retaining overpayments in the form of Project-Based Vouchers that were fraudulently obtained from HUD through the RAD program by approving Empire's nonconforming work.

157. Defendants Empire and Pinnacle knowingly retained the overpayments it fraudulent obtained from HUD.

158. Had the United States and HUD known that Defendants Empire and Pinnacle were retaining fraudulently obtained overpayments, it would have promptly demanded repayment. Defendants Empire and Pinnacle acted to conceal the fraudulently obtained overpayments.

159. The United States, unaware of the retention of overpayments by Defendants Empire and Pinnacle, has been damaged and, therefore, is entitled to statutory damages under the False Claims Act, to be determined by a jury plus a civil penalty for each violation

160. This course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729(a)(l)(A); (B); and (G).

161. Defendants Empire and Pinnacle never refunded such overpayments to the Government, and Defendants Empire and Pinnacle continue to retain such overpayments. Defendants Empire and Pinnacle have knowingly and

improperly avoided or decreased their obligation to transmit the windfall they have gained to the Government in violation of 31 U.S.C. § 3729(a)(l)(G).

**PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties at a minimum of $10,957 and a maximum of $21,916—as adjusted by the Civil Monetary Penalties Inflation Adjustment, 28 C.F.R. § 85.5, and all future amendments thereto—be imposed for each and every false claim that Defendants presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any

recurrence of the unlawful acts for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum percentage of any recovery allowed pursuant the False Claims Act, 31 U.S.C. § 3730(d)(1), (2); and

(f) That this Court award such other and further relief as it deems proper.

## COUNT FOUR

## UNLAWFUL RETALIATION AGAINST RELATOR (31 U.S.C. § 3730(h))

165. Relator re-alleges and incorporates the allegations in paragraphs 1–135 as if fully set forth herein.

166. From the date of his hiring, and continuing to the date of filing this complaint, Relator Brasher has taken actions to investigate the allegations set forth herein; to set the stage for the initiation of this action; and to assist the undersigned attorneys in preparation of this complaint, and in preparing to disclose each Defendants Empire and Pinnacle's fraudulent schemes, false billings, and retention of overpayments to the appropriate government officials.

167. Further, after learning of the Defendants Empire and Pinnacle's fraudulent scheme and false claims, Relator made efforts to stop violations of the False Claims Act by reporting the fraud to his superiors Pingrey, Webb,

Sutherland, and Cheverton at Defendant Empire; to inspectors Chris Lewis and Tim Wilson at Spartanburg; to Semonique Ingram and Jimmy at Defendant Pinnacle; and to Robert Kelly at Hunt Companies.

168. These actions are lawful and fully protected by 31 U.S.C. § 3730(h), the federal False Claims Act's anti-retaliation action.

169. On or about July 20, 2016, Relator Brasher was terminated under false pretenses from his position at Empire. Relator's termination is directly due to his whistleblower activities regarding each Defendant's violations of the False Claims Act. Further, Relator Smith suffered wholly improper and illegal retaliation for reporting and attempting to stop this misconduct.

WHEREFORE, Relator Brasher demands judgment against Defendants for all damages authorized by 31 U.S.C. § 3730(h), including, but not limited to:

(a) Reinstatement to the same seniority status he would have held but for his unlawful firing;

(b) Double the amount of back pay;

(c) Interest on back pay;

(d) Front pay;

(e) Any special damages caused by his firing;

(f) Reasonable attorney's fees and costs; and

(g) Any other relief necessary to make Relator whole.

## DEMAND FOR JURY TRIAL

Relator, on behalf of the United States, demand a jury trial on all claims alleged herein.

Dated this the 6th day of September, 2017.

*/s/ Patrick E. Knie*
PATRICK E. KNIE
Attorney for the Relator
PATRICK E. KNIE LAW OFFICES
250 Magnolia St
Spartanburg, SC 29306
Tel: (864) 582-5118
Fax: (864)585-1615
pknie@knielaw.com

W. DANIEL "DEE" MILES, III*
ARCHIE I. GRUBB, II*
ANDREW E. BRASHIER*
Attorneys for the Relator
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, AL 36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555
dee.miles@beasleyallen.com
andrew.brashier@beasleyallen.com
* (*Pro hac vice* anticipated)

**Counsel for Relator**

## **CERTIFICATE OF SERVICE**

I certify that on September 6, 2017, I electronically filed with the District of South Carolina Clerk's Office a copy of the following which will be served only upon the U.S. Attorney's Office, U.S. Attorney General, pursuant to statute, by hand delivery or via First-Class Certified U.S. Mail as follows:

The Honorable Jeff Sessions
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Honorable Beth Drake
U.S. Attorney for the District of South Carolina
U.S. Attorney's Office
1441 Main Street Suite 500
Columbia, SC 29201

*/s/ Patrick E. Knie*
**Patrick E. Knie**
Counsel for the Relator